842 So.2d 927 (2003)
Robert MICHNAL, Appellant,
v.
PALM COAST DEVELOPMENT, INC., Appellee.
No. 4D01-3118.
District Court of Appeal of Florida, Fourth District.
March 12, 2003.
Rehearing Denied May 7, 2003.
*928 Jack J. Aiello and Gregor J. Schwinghammer, Jr., of Gunster, Yoakley & Stewart, P.A., West Palm Beach, for appellant.
Tim B. Wright, William R. Ponsoldt, Jr., of Wright, Ponsoldt & Lozeau, Stuart, and Russell S. Bohn of Caruso, Burlington, Bohn & Compiani, P.A., West Palm Beach, for appellee.
POLEN, C.J.
Appellant Robert Michnal timely appeals a final judgment entered in favor of Palm Coast Development on its action for breach of a construction contract and foreclosure of a lien. Palm Coast was awarded its attorneys' fees below, which Michnal also appeals. We affirm the lien foreclosure, reverse the breach of contract claim *929 in part for a remittitur, and reverse the attorneys' fees award in part.

FACTUAL BACKGROUND
In the spring of 1996, Michnal began to seek bids from several builders for the construction of his "dream home" on a piece of property located in Sailfish Point. Palm Coast, a relatively young construction company, came in as the low bid at $2,865,000. Michnal told them they needed to lower the cost. Palm Coast proceeded to revise the plans for the house and came up with a number of cost-saving ideas, including a suggestion to change the house's support structure from an Epicore-composite system to a wood floor truss system. Michnal and Palm Coast ultimately entered into a written contract on December 4, 1996, whereby Palm Coast would build the house for $2,075,000. Although the actual blueprints for the house had not been revised, the contract included an addendum which provided the home would be built with a wood floor truss system, and not the Epicore system (as provided in the blueprints).
Construction commenced in early 1997. Aside from a temporary halt caused by a disagreement with a neighbor, construction progressed through late spring of 1997. Specifically, Palm Coast had completed the pilings, the laying of the slab, and had completed the structural work for the first floor. Palm Coast was now ready to bid out the truss system; although the bid price had reflected the use of a wood truss system, the original design plans, which contained the Epicore system, had never been altered. Palm Coast contacted Michnal's original architect and engineer and asked if they would design a wood floor truss system to replace the originally designed Epicore system. They refused. Palm Coast then contacted an independent structural engineer to look at the wood truss proposal on a preliminary basis. This engineer opined a wood truss was doable for this structure, and sent a proposal to do the necessary design work for $2,300, provided the original engineer and architect would sign releases. Palm Coast Vice President Bob McNally then forwarded the independent engineer's proposal, and his request for releases, to Michnal in a letter dated June 6, 1997. The original engineer and architect agreed to grant a release to use and adapt their plans provided Michnal would grant them a plenary release from any liability connected with the home. Michnal refused. Then, on June 27, 1997, the original architect sent Palm Coast a letter which provided since Michnal had refused to grant the releases, they would not allow the use of their drawings to redesign the structure. Palm Coast now realized they would not be able to build the home with the wood truss system and they would have to revert to using the originally designed Epicore system. Since the original bid price had reflected usage of the wood truss system, they would have to re-bid all work related to the truss.
Meanwhile, Jack Behrens, Palm Coast's qualifying agent, had parted ways with Palm Coast on June 6, 1997. Palm Coast duly notified Michnal of Behrens's resignation in a letter dated June 9.
July 10, 1997, Bob McNally held a meeting with Michnal. A number of issues regarding the construction of the house were discussed, including the need to switch back to the Epicore support system. At trial, the two men provided conflicting accounts of what had been discussed, and agreed upon, relative to this issue. Michnal testified McNally had represented the cost of the Epicore system should be the same. McNally testified he had quoted Michnal an estimated price increase of $6,000-$7,000 for reverting back to the Epicore system, but that that figure was *930 only an estimate since the final bids were still pending.
Construction was ground to a halt by the outstanding truss issue; the last date Palm Coast performed physical construction work on the premises was July 16, 1997. Then, on July 21, McNally faxed Michnal a letter outlining the Epicore cost breakdown, as a follow-up to their July 10 meeting. This letter stated the extra cost for reverting back to the Epicore system totaled $30,473.74. The letter requested a response as soon as possible, so that Palm Coast would be able to take advantage of the Epicore contractor's schedule. Michnal was not happy. Though he had tendered a check in the amount of $59,304.60 as partial payment, he stopped payment after receiving the July 21 fax. He also orally advised Palm Coast of the termination and sent a letter to McNally on July 22, which provided the July 21 fax ran contrary to assertions made at the July 10 meeting and Palm Coast was to cease all activity on the job. Thereafter, Palm Coast returned to the job site to remove all of its materials and equipment.
Attempts to peacefully resolve the matter failed. Michnal initially offered to settle up any amounts owed for work actually done, yet Palm Coast maintained it was entitled to full profits on the job. Ultimately, on October 17, 1997, Palm Coast filed a construction lien against Michnal in the amount of $59,304.60. The lien provided Palm Coast had first furnished services to Michnal on January 23, 1997, and the final furnishing of services had occurred on July 23, 1997. The lien was not satisfied and litigation ensued.
Palm Coast filed dual causes of action for breach of contract and foreclosure of a construction lien. Michnal counterclaimed that Palm Coast had breached the contract, alleging defective construction. The parties agreed the matter would be bifurcated: a jury would hear the breach of contract cross-claims and the construction lien claim would later be heard in a bench trial. Michnal subsequently moved for summary judgment on Palm Coast's claim, asserting Palm Coast could not recover on either claim since it did not have a qualifying agent when the contract was terminated, since Behrens, Palm Coast's sole qualifier, had left Palm Coast back on June 6, 1997. See § 489.119(3)(a), Fla. Stat. (1997). This motion was denied; the trial court found section 489.128 salvaged the legality and enforceability of the contract between Michnal and Palm Coast up to the date of the termination, regardless of Palm Coast's lack of a qualifying agent.[1]

THE TRIALS
The jury trial on the breach of contract claims commenced in July of 2000. The court had previously ruled Palm Coast could not seek lost profits for the entire job, only compensation for the work it had actually done. The jury found Michnal had breached the contract by wrongfully terminating Palm Coast, and awarded Palm Coast damages of $80,654.40. The jury found against Michnal on his cross-claim. Michnal moved for a directed verdict and new trial, alleging, inter alia, the damages awarded by the jury were excessive and contrary to the weight of the evidence. Michnal's motions relating to the excessive damages were denied.
*931 Then, the bench trial on the lien claim was held in October of 2000. The majority of the trial focused on whether or not Palm Coast's lien had been timely filed. § 713.08(5), Fla. Stat. (2000)(lien must be filed within 90 days of "final furnishing" of labor, services, or materials). Since Florida's lien law only provides a 90 day window within which to file a lien, for Palm Coast's lien, filed October 17, 1997, to be timely, its "final furnishing" had to have occurred on or after July 19, 1997. Michnal raised two arguments, one legal and one factual, arguing Palm Coast's lien had not been timely filed. Legally, Michnal contended Palm Coast could not furnish labor, services or materials within the 90 day window, since its sole qualifier, Behrens, had undisputedly departed before that date.[2] Factually, Michnal contended no labor, services, or materials had been furnished within the 90 day window, where the last date physical construction occurred on the property had been July 16, 1997. Consistent with its previous ruling on Michnal's summary judgment, the trial court found the legality of Palm Coast's lien was salvaged by s. 489.128. The court also found the lien was timely filed within the meaning of s. 713.08(5). Since Palm Coast's lien claim was held to be enforceable, Palm Coast was deemed the prevailing party for purposes of attorneys' fees under chapter 713.
Michnal subsequently filed a motion for reconsideration, arguing the testimony established the lien had not been timely filed. A hearing was then held on this motion, where the trial court affirmed its earlier rulings, yet this time with more specificity, finding two specific activities, the July 21 fax and Palm Coast's post-termination retrieval of its equipment, constituted "final furnishings" under s. 713.08(5).
A hearing on attorneys' fees was held in April of 2001. The trial court's determination of the number of hours billed and the rate to be applied has not been challenged on appeal. However, the parties argued below, and continue to do so on appeal, over the applicability of a multiplier. Specifically, Palm Coast sought a multiplier of 2.5, whereas Michnal requested a negative multiplier of .5. The trial court ruled a multiplier was appropriate and applied a multiplier of 1.75 to the lodestar, resulting in a fee award of $317,128.19.
This case appears to be an example of the proverbial tail wagging the dog. Although similar (in this case identical) damages are recoverable in a breach of contract or foreclosure of a construction lien claim, here the lien has taken on paramount importance, because the lien, and only the lien, allows for the recovery of prevailing party attorneys' fees. As such, we have two parties fighting over a $317,128.19 fee award, by way of a lien award totaling $58,952.45 after set-offs. But such is our system. Notwithstanding, *932 this case presents novel issues, both legal and factual, regarding Florida's Construction Lien Law, chapter 713. The following analysis is highly fact specific, and this court's ultimate holdings should be narrowly construed.

LEGAL ABILITY TO PURSUE LIEN
Under Florida law, a construction company must apply for a certificate of authority (i.e., a license) through a qualifying agent. § 489.119(2), Fla. Stat. (1997). Where a construction company loses its sole qualifier, as Palm Coast did when Behrens resigned, it may not engage in contracting until another qualifying agent is employed unless the company has been granted a temporary nonrenewable certificate. § 489.119(3)(a), Fla. Stat. (1997). Although Palm Coast hired a new individual to replace Behrens in July of 1997, that individual's license was inactive at the time, and was not reactivated until September of 1997. Palm Coast had no qualifying agent after Behrens' departure, nor was it ever granted a temporary certificate. Palm Coast was not licensed to engage in contracting after July 17, 1997 at the latest.[3] If Palm Coast engaged in work as a contractor after July 17, 1997, a factual occurrence it must indulge in in order for its construction lien to have been timely filed, it could have been subject to disciplinary sanctions by the DPR. See § 489.129(1)(I), Fla. Stat. (1997). However, failure to maintain its license (through a qualifying agent) does not render Palm Coast's lien on Michnal's home unenforceable.
The controlling version of section 489.128, Florida Statutes (1999), provides:
As a matter of public policy, contracts entered into on or after October 1, 1990, and performed in full or in part by any contractor who fails to obtain or maintain a license in accordance with this part shall be unenforceable in law or in equity. However, in the event the contractor obtains or reinstates his or her license, the provisions of this section shall no longer apply. (Emphasis supplied.)
It is undisputed Palm Coast reinstated its license before it filed the instant lien. As such, the enforceability of Palm Coast's contract with Michnal was salvaged. See also Riverwalk Apartments, L.P. v. RTM Gen. Contractors, Inc., 779 So.2d 537 (Fla. 2d DCA 2000)(finding contractor's attempt to cure past licensing defect by filing of fictitious name registration after termination of contract, but before filing of lien, was ineffectual under section 489.128, since the contractor failed to obtain or reinstate its license). Since the contract was enforceable, and Palm Coast was licensed at the time it filed the lien, the lien was legally enforceable, provided the additional requirements (e.g., timeliness) were met. See Viking Communications Corp. v. Peeler Const. Co., 367 So.2d 737 (Fla. 4th DCA 1979)(since a contract is essential to any mechanic's [contractor's] lien, the court must look first to the enforceability of the basic contractual obligation); § 713.02(7), Fla. Stat. (1997).

TIMELINESS"FINAL FURNISHING"
Still, Michnal contends even if Palm Coast's lien could have been legally enforceable, the filing of the lien was untimely, and hence the lien is unenforceable. See § 713.08(5), Fla. Stat. (1997); Stunkel v. Gazebo Landscaping Design, 660 So.2d *933 623, 625-26 (Fla.1995)(lien law is a creature of statute and must be strictly construed; strict adherence to the lien law's time requirements are necessary since contracting parties need certainty about when time periods for notification begin). This issue, when the "final furnishing" of labor, services, or materials has occurred, is one to be resolved by the trier of fact. See Aronson v. Keating, 386 So.2d 822 (Fla. 4th DCA 1980); Wolford v. Sapp, 448 So.2d 1113 (Fla. 1st DCA 1984). The test to be applied in determining whether particular work constitutes a "final furnishing" under s. 713.08(5) is whether the work was done in good faith, within a reasonable time, in pursuance of the terms of the contract, and whether it was necessary to a "finished job." Aronson, 386 So.2d at 823. Applying the Aronson test, we concur with the trial court's determination that Palm Coast's "final furnishing" occurred within the 90 day window, i.e., after July 19, 1997.
There are no steadfast rules to apply in making this determination; rather courts are to apply the Aronson test, while recognizing the determination whether particular services performed are within the contemplation of the construction lien law for purposes of the limitation period will depend upon the circumstances of each particular case. In this vein, a sister court has noted, upon its review of the pertinent case law, the salient question seems to be whether the challenged labor, services, or materials were related directly to the property, or were merely incidental to it. See Robert M. Swedroe, Architect/Planners, A.I.A., P.A. v. First Am. Inv. Corp., 565 So.2d 349, 353 (Fla. 1st DCA 1990) (citations omitted). On these facts, we find the July 21 fax from Palm Coast to Michnal constitutes the "furnishing" of a "service" for purposes of the limitation period. We hold this service rendered by Palm Coast, an attempt by the contractor to resolve the outstanding truss issues under the facts of this case, satisfies the four-prongs of the Aronson test. First, we find the July 21 letter was prepared and transmitted in good faith; per the contract and addendum, switching to the Epicore system would constitute a change order, a change which would have to be accepted in writing by Michnal before Palm Coast could proceed. We note the July 21 fax was sent before Michnal terminated the contract, and there is no reason to presume this fax was anything but a genuine attempt to resolve the outstanding truss issue. Second, we are convinced the provision of this service was done within a reasonable time, where the letter was faxed shortly after the parties' July 10 meeting. Third, we find this service was provided in pursuance of the terms of the contract. As discussed, supra, Palm Coast could not make a change without Michnal's written authorization. Furthermore, resolution of the truss issue was needed before Palm Coast could proceed with the construction of the second floor. Similarly, this service was necessary to a "finished job"construction of a two-story residence. Unlike the services rendered in Swedroe, this service was directly related to the improvement of the property, i.e., construction of the second story of a two-story home. Cf. Swedroe, 565 So.2d at 353 (architect sought a lien for services rendered as the property owner's expert witness in arbitration proceedings). Since we are affirming the timeliness of the lien based on the July 21 fax, we need not address whether or not Palm Coast's clean-up and retrieval activities, on these facts, constituted a "final furnishing" for lien law purposes. The lien foreclosure in Palm Coast's favor, and the concomitant finding that Palm Coast was the prevailing party for attorneys' fees purposes, is thus affirmed.
*934 We agree with Michnal's contention a remittitur should have been entered on the jury's award of damages on the breach of contract claim. No evidence was presented below of damages above and beyond the final bill submitted by Palm Coast for $59,304.60. Accordingly, we reverse for the trial court to enter an order of remittitur. We find Michnal's challenge of certain evidentiary rulings by the trial court in the jury trial unconvincing.

ATTORNEYS FEE MULTIPLIER
We also agree with Michnal's contention the final judgment on attorneys' fees must be reversed. In pondering the applicability of a multiplier in this case, the trial judge stated:
An issue is whether or not a case that, when filed, does not merit a multiplier can become one that does during the progress of the case. The Court determines that it can, that this case did, and in this case that is "fair." If, as in this case, a party elects a "scorched earth" defense, raises some defenses with little or no merit, over does discovery and relitigates issues, without a multiplier a plaintiff could be economically overwhelmed....Without a risk reward mechanism, faced with the defense in this case, plaintiff would have to surrender. The Court finds that a multiplier is appropriate so that attorneys may continue in a meritorious case that has more risk and difficulty as a result of the defense. The Court has found no law that allows or prohibits the Court from doing the following. The Court determines that a multiplier is applicable....
With all due respect to the trial court, we find all multiplier jurisprudence prohibits a trial court from doing what it did in the instant case.
As our Supreme Court laid out in Standard Guaranty Insurance Co. v. Quanstrom, 555 So.2d 828, 834 (Fla.1990), trial courts are to consider the following factors in determining whether a multiplier should be applied to a fee award: (1) whether the relevant market requires a contingency fee multiplier to obtain competent counsel; (2) whether the attorney was able to mitigate the risk of nonpayment in any way; and (3) whether any of the factors set forth in Fla. Patient's Compensation Fund v. Rowe, 472 So.2d 1145 (Fla.1985) are applicable, especially, the amount involved, the results obtained, and the type of fee arrangement between the attorney and the client. Further expounding on this issue, the Supreme Court has noted a primary rationale for the contingency risk multiplier is to provide access to competent counsel for those who could not afford it. See Bell v. U.S.B. Acquisition Co., 734 So.2d 403, 411 (Fla.1999)("The importance of this policy consideration is highlighted by the fact that the very first factor listed in Quanstrom ... is `whether the relevant market requires a contingency fee multiplier to obtain competent counsel.'"). Multipliers are intended to level the playing field, to provide litigants, who may otherwise lack the resources, to obtain competent counsel, as a means of access to the legal system. As discussed in Quanstrom and its progeny, the appropriate time frame for determining whether a multiplier is "necessary" is when the party is seeking the employ of counsel. See, e.g., Simmons v. Royal Floral Distributors, Inc., 724 So.2d 99 (Fla. 4th DCA 1998)(there must be evidence that a contingent fee agreement was necessary in order for the prevailing party to have obtained competent counsel if a multiplier is to be imposed on the nonprevailing party).
Here, the trial court found a multiplier was not warranted at the time the Palm Coast's case was filed, an event which occurred *935 after Palm Coast had already obtained counsel, the same counsel that followed this case through to its completion. There is no precedent for using a multiplier as an incentive for a party's counsel to "stay on a case." While we address only the instant case, we recognize allowing such could set a dangerous precedent; one can imagine a whole new arena of fee litigation, attorneys arguing they are entitled to a multiplied fee award in practically every case that is litigated to the end, asserting the case "became" harder than anticipated, and the incentive of a multiplier was needed to stay on the case. This is certainly not the case for expanding multiplier jurisprudence, and awarding a multiplier on this basis. Both sides were represented by well-known, and well-respected counsel immediately after the dispute arose; we are fairly certain each side knew what they were up against at the outset of the case. While as a general rule, both parties in a lawsuit share responsibility for protracted litigation, we note a number of the issues in the instant case, which Michnal vigorously defended, were novel and complex, and had been Palm Coast's own creation (e.g., lack of qualifying agent, timeliness of lien). Since the findings in the final judgment on attorneys' fees do not support the application of a multiplier, we hold the application of a multiplier was inappropriate, and reverse for entry of a non-multiplied fee award. See Speer v. Mason, 769 So.2d 1102 (Fla. 4th DCA 2000).

CONCLUSION
In sum, the trial court's denial of the remittitur on the jury award for breach damages is reversed, the lien foreclosure in Palm Coast's favor is affirmed and the attendant prevailing party attorneys' fee award is affirmed in part, but the trial court's application of a contingency fee multiplier is reversed. Palm Coast, as the prevailing party on the lien claim on appeal, is entitled to its appellate attorneys' fees. § 713.29, Fla. Stat. (2001). Michnal's prayer for appellate attorneys' fees is denied.
AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.
GUNTHER and MAY, JJ., concur.
NOTES
[1] This statutory provision was amended in 2000, removing the curative language on which the trial court had relied in finding the enforceability of the contract had been salvaged. See Ch.2000-372, § 35, Laws of Fla., eff. July 1, 2000. We find the trial court properly applied the pre-2000 version of this statute, since the amendment constitutes a substantive change of the law, not to be applied retroactively. See The Palms v. Magil Constr. Fla., Inc., 785 So.2d 597 (Fla. 3d DCA 2001).
[2] Although Behrens testified he had parted ways with Palm Coast on June 6, 1997, Palm Coast testified Behrens had let them "hang his license" until July 17, 1997. Department of Professional Regulation ("DPR") records reflected Behrens' license at Palm Coast was classified as active until July 17, 1997. Though this issue has no bearing on this court's ultimate ruling, we note all evidence before this court suggests Behrens performed no supervisory functions on behalf of Palm Coast after his resignation on June 6. Any attempt by Palm Coast to "hang his license" after this date seems to run directly contrary to the purpose of chapter 489, and we are mindful sanctions may be imposed by the DPR against parties that enter into improper qualifier arrangements. See 489.129(1)(e), Fla. Stat. (1997). That, however, did not affect Palm Coast's ability to seek payment under the mechanic's lien laws, pursuant to the "salvaging statute," § 489.128, Fla. Stat. (1999), discussed, infra.
[3] See FN2. This fact served as the basis for the trial court's ruling that Palm Coast could not sue for lost profits on the job on its breach claim; Palm Coast could not recover for profits for work it would not have been licensed to undertake. However, the trial court found Palm Coast's lien claim, as a whole, was salvaged by s. 489.128.